IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFERY ABEL, | ) | CASE NO. 3:18-cv-02848 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Jeffery Abel ("Plaintiff" or "Abel") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 16.

For the reasons explained herein, the Court finds that, without a more thorough explanation by the ALJ as to how the state agency reviewing physicians' opinions were entitled to the greatest weight even though their opinions were not based on more detailed or comprehensive information than was available to Abel's treating sources, the Court is unable to assess whether the ALJ's decision is supported by substantial evidence. Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this Memorandum Opinion and Order.

# I. Procedural History

On April 19, 2016, Abel protectively filed[1] an application for disability insurance benefits ("DIB"). Tr. 12, 79, 93, 182-183. Abel alleged a disability onset date of February 23, 2016. Tr. 12, 182, 202. He alleged disability due to back surgery, spinal stenosis, diabetes, depression, and degenerative disc disease. Tr. 79, 111, 119, 206.

After initial denial by the state agency (Tr. 111-114) and denial upon reconsideration (Tr. 119-125), Abel requested a hearing (Tr. 126-127). A hearing was held before the ALJ on January 23, 2018. Tr. 12, 28-78. On March 26, 2018, the ALJ issued an unfavorable decision (Tr. 9-27), finding that Abel had not been under a disability within the meaning of the Social Security Act, from February 23, 2016, through the date of the decision (Tr. 13, 22). Abel requested review of the ALJ's decision by the Appeals Council. Tr. 181. On October 10, 2018, the Appeals Council denied Abel's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

### A. Personal, vocational and educational evidence

Abel was born in 1969. Tr. 35, 79, 182, 202. He was 48 years old at the time of the hearing. Tr. 35. Abel is divorced and has one adult daughter. Tr. 36. At the time of the hearing, Abel lived in a ranch-style home with a roommate with whom he had resided for 12 years. Tr. 37. Abel graduated from high school and attended school to obtain a CDL - commercial driving license. Tr. 40-41. Abel last worked in February 2016. Tr. 41. He left

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 1/15/2020).

work to have surgery.  Tr. 41.  He received short-term disability for six months.  Tr. 41.  His past work includes work as a machinist and tool room supervisor (also referred to as tool crib attendant).  Tr. 42-49, 70-71.

**B.    Medical evidence[2]**

**1.    Treatment history**

Abel had back surgery in February 2016 and again in May 2017.  Prior to these surgeries, Abel complained of back and leg pain as well as problems with his neck and upper extremities. *See e.g.,* Tr. 491-493 (4/20/2015, neurosurgeon Dr. Michael A. Healy, M.D., office notes); Tr. 391 (12/14/2015, primary care physician Dr. Phillip H. Fisher, M.D., office notes).  Prior to surgery in February 2016, Abel had multiple injections with some relief.  *See e.g.*, Tr. 349, 351, 353, 391, 455, 457, 459-460.  Per Dr. Fisher's order, a lumbar MRI was taken on March 23, 2015.  Tr. 318-319.

During an April 20, 2015, visit, Dr. Healy reviewed the lumbar MRI results, noting the MRI showed a disc herniation at the L5-S1 and some degenerative changes and stenosis at L4-L5 and L3-L4.  Tr. 491.  Dr. Healy did not see any issues higher up in Abel's spine that could be causing proximal lower level extremity weakness.  Tr. 491.  Dr. Healy ordered a cervical spine MRI and an EMG/NCV of Abel's bilateral upper and lower extremities.  Tr. 492.

The EMG was performed on May 4, 2015.  Tr. 403-404.  Dr. Peter P. Zangara, M.D., who performed the EMG indicated that the only abnormal neurophysiologic feature was in the left lower limb and related to an atrophic left extensor digitorum brevis muscle and lack of muscle effort.  Tr. 403.  There was inadequate criteria for a diagnosis of acute radiculopathy, plexopathy, or more specific neuropathy aside from the left common peroneal nerve.  Tr. 403.

---

[2] Abel's arguments in this appeal pertain to the ALJ's evaluation of his physical impairments.  Therefore, the evidence summarized herein is generally limited to evidence relating to his physical impairments.

Abel's cervical MRI was performed on May 16, 2016. Tr. 355-356. It showed early degenerative disease and acquired canal narrowing at the C5-C6 and C6-C7 levels that was mild to moderate; there was a focal disc protrusion at the C6-C7 level further narrowing the right lateral recess; and there was no direct cord impingement or critical disease. Tr. 356.

Dr. Healy ultimately recommended surgical intervention due to failure of conservative treatment. Tr. 430. On February 23, 2016, Dr. Healy performed an L4-L5 Gill decompression followed by an interbody posterior lateral fusion. Tr. 430-433.

During an April 13, 2016, visit with Dr. Healy, Abel relayed that he had been terminated from work even though Dr. Healy noted that he saw nothing that would have precluded him from returning to work after a legitimate rehab period. Tr. 499. Also, Abel's insurance had been terminated so he was unable to get any physical therapy. Tr. 499. Dr. Healy continued Abel's short-term disability and recommended that he continue with therapy. Tr. 499. Dr. Healy indicated that Abel's x-rays looked good and he could be removed from his brace. Tr. 499.

Abel saw Dr. Fisher on April 19, 2016, for his back pain. Tr. 379-381. Abel complained of muscle aches and back pain. Tr. 380. Dr. Fisher's musculoskeletal examination findings were "normal overall joint exam, no spinal abnormalities detected, [and] no gross swelling[.]" Tr. 381. Dr. Fisher prescribed Oxycontin. Tr. 380.

When Abel saw Dr. Healy the following month on May 18, 2016, Abel complained of horrible back and leg pain. Tr. 498. Dr. Healy noted Abel had no insurance and therefore could not attend therapy or obtain any studies. Tr. 498. Healy did not see any profound weakness, sensory loss, or reflex changes. Tr. 498. Abel was tender in his back but there was no clear swelling. Tr. 498. Dr. Healy also noted that Abel had applied for disability and Dr. Healy found that to be "quite reasonable." Tr. 498. Abel also saw Dr. Fisher on May 18, 2016. Tr. 376-377.

Abel was taking Oxycontin for pain.  Tr. 377.  Abel relayed that Percocet did not "touch the pain[.]" Tr. 377.

During the remainder of 2016 and throughout 2017, Abel continued to see Dr. Fisher for follow up regarding his back pain.  *See e.g.*, Tr.  376-379, 558-568, 604-608, 614-647.  During a June 15, 2016, visit with Dr. Fisher, Abel complained of severe back pain with numbness down his leg.  Tr. 374.  He relayed that he was unable to afford Oxycontin.  Tr. 374.  Once he had insurance, Abel wanted to start pain management.  Tr. 374.  Dr. Fisher prescribed Percocet and noted that he would write Abel's prescriptions for pain medications and notify Dr. Healy.  Tr. 376.

When Abel saw Dr. Healy on June 22, 2016, he had Medicaid coverage so Dr. Healy was able to order a lumbar spine MRI that they had been holding off on due to the expense.  Tr. 497.  Dr. Healy noted that he was continuing to hold Abel off from work.  Tr. 497.  Dr. Healy planned to reassess following the MRI.  Tr. 397.  Abel had the lumbar MRI performed on July 15, 2016.  Tr. 438-439.  It showed normal alignment; some mild edema in the posterior soft tissues without evidence of fluid collection; and postoperative and multilevel degenerative changes, including facet degenerative changes at the L1-2 and L2-3; at the L3-4 - a circumferential disc bulge immediately adjacent to the L3 nerve roots, impingement of the lateral recesses at the L4 nerve roots, facet degenerative changes and thickening of the ligamentum flavum with moderate canal stenosis and mild neural foraminal narrowing; at the L4-5 - epidural fibrosis and facet degenerative changes with mild canal stenosis and mild bilateral neural foraminal narrowing; and at the L5-S1 - circumferential disc bulge with a central and left paracentral protrusion immediately adjacent to the left S1 nerve root, facet degenerative changes, and thickening of the ligamentum flavum with no canal stenosis.  Tr. 438.

Abel saw Dr. Mark D. Hammerly, Ph.D., on September 2, 2016, for a psychological consultative evaluation. Tr. 547-556. Dr. Hammerly diagnosed major depression, recurrent, moderate and anxiety disorder, NOS. Tr. 553. Dr. Hammerly observed that Abel's physical medical issues appeared tied to his psychological issues and he felt that mitigation or alleviation of the physical symptoms was likely necessary in order for there to be significant psychological progress. Tr. 554.

Abel saw Dr. Fisher on September 7, 2016. Tr. 558-562. Abel was taking Percocet and Oxycontin for his back pain. Tr. 558. He described the severity of his pain as moderate. Tr. 558. Once Abel's insurance was in place, he was planning a second surgery with Dr. Healy – a microdiskectomy. Tr. 558. Physical examination findings were unremarkable. Tr. 560.

When Abel saw Dr. Fisher on October 5, 2016, he was still having back pain and needed a refill of his Percocet as well as Gabapentin, which he was also taking. Tr. 563. Abel described the severity of his pain as mild-moderate. Tr. 563. Abel had twisted his left ankle a few weeks earlier and he relayed it was painful to walk. Tr. 563. On examination, Dr. Fisher noted musculoskeletal tenderness. Tr. 565.

During a November 2, 2016, visit with Dr. Fisher, Abel complained of chronic back pain that shot into his buttock and leg on the left and sometimes on the right. Tr. 604. Abel described his pain as severe. Tr. 604. Abel noted some relief with Percocet. Tr. 604. Physical examination findings were unremarkable. Tr. 606. Dr. Fisher provided Abel with a prescription for Percocet. Tr. 607.

In January and February 2017, Abel saw a pain management physician, Elizabeth Fowler, M.D., at St. Luke's Hospital. Tr. 667-675. During his pain management visits, Abel had abnormal physical examination findings, including positive straight leg raise, limited lumbar

range of motion, paraspinal tenderness bilaterally, and antalgic gait to the left. Tr. 670, 673-674. Dr. Fowler discussed various interventions, including increasing Abel's Neurontin, a trial of Zanaflex, an EMG, and lumbar injections. Tr. 670, 674. Abel was considering a second surgery. Tr. 670, 674. At the February 2017 visit, Dr. Fowler noted that Abel was reluctant to proceed with the suggested interventions and he should follow up with Dr. Healy. Tr. 670.

Because Dr. Healy had recommended a second surgery at the L5-S1 level, in February 2017, Abel sought a second opinion from Dr. David D. Lewis, M.D. Tr. 786-787. On examination, Dr. Lewis observed that Abel was in no apparent distress; strength was equal in his upper extremities; strength was 4 out of 5 on plantar flexion of his left lower extremity; reflexes were normal and symmetric; toes were "downgoing"; Hoffman sign was negative; and gait was normal. Tr. 787. Dr. Lewis reviewed Abel's lumbar MRI and noted that there was evidence of a fusion at L4-5 and evidence of degenerative disc disease at the L5-S1 level with a disc bulge to the left causing left lateral recess stenosis. Tr. 787. Dr. Lewis informed Abel that he agreed with Dr. Healy's recommendation. Tr. 786.

Abel saw Dr. Healy for follow up on April 4, 2017, regarding his low back pain and left leg pain. Tr. 595. Dr. Healy noted that following the fusion surgery at the L4-5 level, Abel started to develop symptoms down his left leg that were different. Tr. 595. Dr. Healy observed a tight foraminal area over the left L5-S1 level; positive straight leg raise and absent ankle jerk on the left side; and slight gastrocnemius weakness. Tr. 595. Dr. Healy noted that Abel had been treated conservatively since his surgery in 2016 but he now recommended a hemilaminectomy and microdiskectomy at the left L5-S1 level. Tr. 595.

On May 11, 2017, Dr. Healy performed a left L5-S1 hemilaminectomy miscrodiskectomy with foraminotomy. Tr. 765-766. Following his surgery, Abel attended physical therapy from

May 31, 2017, through July 3, 2017.  Tr. 707-764.  Physical therapy was put on hold in July 2017 pending further evaluation by a neurologist.  Tr. 764.

Abel saw Dr. Fisher on May 30, 2017, for his lower back pain.  Tr. 642.  Abel was tender at the surgical site and described his pain level as moderate.  Tr. 642.  Abel was using a 72-hour fentanyl Duragesic patch which provided him with more consistent pain relief.  Tr. 642-643.  Dr. Fisher's physical examination findings were unremarkable.  Tr. 644-645.

On Dr. Healy's order, on July 10, 2017, Abel had an EMG and NCV performed due to bilateral radicular S1 pain, numbness and tingling that were worse in the left lower extremity than right lower extremity.  Tr. 648.  The impression from the testing was "mostly unremarkable"; there was an "[a]bsence of left Peroneal motor to EBD possibly due to EBD atrophy[]"; "mild, chronic Right, and possibly left L5-S1 radiculopathy[]"; and "[n]o motor units recorded in left thigh muscles at all (severe upper lumbar plexopathy, L2-3-4?)[.]"  Tr. 648.

Abel saw Dr. Fisher on July 25, 2017, for a medication check, review of his EMG and his back pain.  Tr. 683-686.  Abel described his pain level as moderate to severe.  Tr. 683.  He explained that his fentanyl patching was wearing off by the third day and not providing him much relief on that third day.  Tr. 683.  Physical examination findings were unremarkable.  Tr. 685.  Abel had anxiety and reported having a panic attack the day before his visit.  Tr. 683, 686.

On July 26, 2017, Abel saw Dr. Healy, complaining of persistent bilateral lower extremity radicular type pain.  Tr. 768.  Dr. Healy noted that Abel had not improved with therapy following his surgery.  Tr. 768.  On examination, Dr. Healy observed no specific weakness, reflex pathology or sensory loss.  Tr. 768.  Dr. Healy reviewed an MRI and noted that there were some mild changes at the L5-S1 and some mild degenerative changes above the fusion but nothing that looked surgical.  Tr. 768.  Dr. Healy noted that the EMG showed chronic changes.

Tr. 768.  Dr. Healy did not feel further surgical intervention was required.  Tr. 768.  Dr. Healy noted that Abel might require a referral to the pain clinic and he recommended a functional capacity evaluation to see what Abel could and could not do.  Tr. 768.  Dr. Healy did not feel that Abel would be able to return to his work as a tool and dye maker.  Tr. 768.

 Abel saw Dr. Fisher on August 22, 2017, for a medication check, depression, anxiety and back pain.  Tr. 688-692.  Abel was having an increase in panic attacks.  Tr. 688.  He described his pain level as severe.  Tr. 688.  Abel relayed that he was going to be getting a functional capacity evaluation per Dr. Healy's order.  Tr. 688.  Physical examination findings were unremarkable.  Tr. 690-691.

On January 10, 2018, Abel saw Dr. Fisher for a medication check, anxiety and back pain.  Tr. 781-784.  Abel had slipped on the ice and hurt his back.  Tr. 781.  He described his pain level as moderate.  Tr. 781.  Physical examination findings were unremarkable.  Tr. 783-784.

### 2.  Opinion evidence

#### *Dr. Fisher*

Dr. Fisher, who reported treating Abel on a monthly basis for years, (Tr. 651), completed two medical source statements.  The first statement was completed on July 25, 2016 (Tr. 541-544) and the second was completed on September 25, 2017 (Tr. 651-654).

In the July 2016 statement, Dr. Fisher indicated that Abel had diagnoses of spinal stenosis, degenerative joint disease, and herniated disc.  Tr. 543.  Dr. Fisher indicated that the onset of Abel's severe back pain was May 2015.  Tr. 543.  Dr. Fisher noted that Abel's clinical examination findings were normal and all testing had been performed per Dr. Healy.  Tr. 543.  Dr. Fisher indicated that clinical intervention included back surgery, performed by Dr. Healy on February 23, 2016.  Tr. 543.  Abel's medications included Gabapentin, Xanax, Oxycodone, and

Percocet. Tr. 544. Dr. Fisher indicated that Abel had undergone physical therapy prior to his surgery. Tr. 544. When asked to describe any limitations that Abel's impairments imposed on his ability to perform sustained work activity, Dr. Fisher responded [a]ll the above limited by severe pain[.]" Tr. 544.

In the September 2017 statement, Dr. Fisher indicated that Abel's diagnosis was "L5[-]S1 failed back surg[ery]" and he had the following symptoms: back pain and depression. Tr. 651. Dr. Fisher described Abel's pain as severe and occurring daily. Tr. 651. He noted that Abel had failed the functional capacity test. Tr. 651. Dr. Fisher identified the following clinical findings and objective signs: tenderness and left leg numbness. Tr. 651. Abel's treatment included surgery and multiple medications. Tr. 651. Dr. Fisher reported that emotional factors contributed to Abel's symptoms and functional limitations. Tr. 652. Dr. Fisher listed the following medication side effects: fatigue and drowsiness. Tr. 652. Dr. Fisher indicated that, due to his impairments, Abel had the following functional limitations: he could walk less than one block without rest or severe pain; he could sit at one time for 1 hour; he could stand at one time for 1 hour; he could sit and stand/walk for a total of less than 2 hours in an 8-hour workday; Abel required a job that would allow for shifting positions at will from sitting, standing or walking; during an 8-hour workday, Abel would need to walk around every 30 minutes for 10 minutes at a time; Abel would need to take unscheduled breaks during a workday every hour for 30 minutes; Abel would likely be off task 25% or more during the workday; Abel would be unable to tolerate even "low stress" work due to depression; Abel would likely have "good days" and "bad days;" Abel would likely be absent from work more than 4 days per month due to his impairments; Abel would never be able to lift any amount of weight; and Abel would never be able to twist, stoop (bend), crouch/squat, climb stairs, and climb ladders. Tr. 652-654. Dr.

Fisher indicated that Abel's impairments were reasonably consistent with the symptoms and limitations set forth in the medical statement completed by Dr. Fisher. Tr. 654.

*Functional capacity evaluation*

Upon Dr. Healy's order, on September 14, 2017, Julianne M. Dunphy, DPT, PT, saw Abel for the purpose of conducting a functional capacity evaluation ("FCE"). Tr. 655-666. Ms. Dunphy signed the FCE on September 14, 2017, and Dr. Healy countersigned the FCE on September 27, 2017. Tr. 666. In the FCE, Ms. Dunphy indicated that Abel was pleasant; displayed good effort during the test; and he was able to tolerate the test with minimal rest breaks. Tr. 656.

Abel's chief complaint was his history of low back pain and left leg radicular symptoms since falling out of a tree in 2014. Tr. 656. Ms. Dunphy noted that Abel had a lumbar fusion of the L4-L5 in February 2016 and a microdiskectomy of the left L5-S1 in May 2017. Tr. 656. Abel reported little relief of the radicular symptoms in his left leg. Tr. 656. Abel had multiple episodes of physical therapy and pain management appointments. Tr. 656. Abel's pain was manageable with medication but increased with activity. Tr. 656. Abel had neuropathy in both legs and nerve damage to muscles in his left thigh. Tr. 656. Abel used a cane for ambulation in and outside his home. Tr. 656. He relayed that he had 2-3 falls per month and additional near falls. Tr. 656. Abel indicated he had been unable to return to his past job as a machinist due to low back pain and inability to perform lifting and standing required by the job. Tr. 656. He was in the process of applying for social security disability. Tr. 656.

Ms. Dunphy stated the following regarding Abel's functional ability:

The patient meets the physical job duties consistent with the Sedentary Physical Demand Level. Based on his tolerance of the test and subjective information, Mr. Abel should be able to tolerate a 4 hour work day/20 hours per week. Patient would

benefit from ability to change positions or stand every 30 minutes with sedentary job.

Tr. 656.

She stated further that Abel demonstrated good reliability of effort with a coefficient of variation consistent 94% of the time.  Tr. 656.

*State agency reviewing physicians*

On September 16, 2016, state agency reviewing physician Rannie Amiri, M.D., completed a physical RFC assessment.  Tr. 87-88.  Dr. Amiri opined that Abel had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull unlimitedly, except as limited for lifting and/or carrying.  Tr. 87.  Dr. Amiri opined that Abel could never climb ladders/ropes/scaffolds; he could occasionally stoop and crawl; and he could frequently climb ramps/stairs, balance, kneel, and crouch.  Tr. 87.  Also, Dr. Amiri opined that Abel should avoid exposure to hazards, i.e., he should avoid operating dangerous machinery and unprotected heights.  Tr. 88.

Upon reconsideration, on November 17, 2016, state agency reviewing physician Gerald Klyop, M.D., completed a physical RFC assessment, wherein he reached the same conclusions as Dr. Amiri.  Tr. 102-104.

**C.    Testimonial evidence**

**1.    Plaintiff's testimony**[3]

Abel was represented and testified at the hearing.  Tr. 30-31, 35-69.  There was a period of time since 2016 when Abel was without health insurance coverage because he was receiving

---

[3] During the hearing, Abel requested permission to stand.  Tr. 52.  The ALJ explained that Abel could sit or stand at will and did not need to ask permission to do so.  Tr. 52.

short-term disability which was considered income for Medicaid guidelines.  Tr. 37-39.  Abel could not recall the specific period of time that he was without insurance coverage but noted that there was some treatment that his doctor wanted him to have that he was unable to follow through with because of the lack of insurance coverage.  Tr. 38-39.

Abel had a cane with him at the hearing.  Tr. 37.  He explained that the cane was not prescribed but he uses the cane almost every day for balance and for walking long distances or on uneven or icy terrain.  Tr. 37.  Abel has a driver's license and estimated driving three times each week.  Tr. 40.  Abel can drive about 30 minutes before he gets uncomfortable.  Tr. 40.

Abel explained that the main reason he is unable to work is his chronic lower back pain and numbness and pain, primarily in his left leg.  Tr. 50.  Abel explained that the pain radiates into his leg.  Tr. 50.  On a scale of one to ten, with ten being the worst pain, Abel indicated that most of the time his pain was a six.  Tr. 50.  He explained that bending, kneeling, uneven ground, stairs, and walking too far make his pain worse.  Tr. 50.  To alleviate his pain, Abel takes medication, including use of a 3-day fentanyl patch.  Tr. 51.  Abel also takes Gabapentin for neuropathy in his legs and a muscle relaxer for his back that he takes at night.  Tr. 51.  During the night, Abel usually wakes up a minimum of three times with tingling and numbness in his back.  Tr. 52.  Once Abel readjusts himself, he is able to fall back asleep.  Tr. 52.

Abel takes Cymbalta for depression, which causes drowsiness.  Tr. 51, 59.  He takes Xanax for anxiety.  Tr. 59.  Abel has problems with PTSD that relate back to a dog attacking him on his face when he was a child.  Tr. 66.  He has flashbacks at least once a week.  Tr. 66.  Abel cannot afford to see a mental health specialist so he sees his primary care physician Dr. Fisher for his depression and anxiety medications.  Tr. 60.

Abel is treated by Dr. Healy for his back issues. Tr. 55. While Dr. Healy did not prescribe Abel's cane, he is aware Abel uses one. Tr. 55. Abel indicated that in 2012 or 2013 he fell out of a tree and was treated at the emergency room. Tr. 52-53. Abel has had two surgeries on his back, one in February 2016 and a second one in May 2017. Tr. 56-57. Abel's first surgery involved an L4-5 fusion. Tr. 56. And his surgery in May 2017 involved an L5-S1 microdiskectomy. Tr. 57-58.

Prior to his back surgery in February 2016, Abel received injections. Tr. 53. He also had physical therapy prior to and after his surgery. Tr. 53-54. Abel last attended physical therapy in July 2017. Tr. 54. He stopped attending physical therapy because it was not helping and was, if anything, aggravating his back. Tr. 54. Abel tried using a TENS unit on his back both before and after surgery. Tr. 54. He had used it a couple of months prior to the hearing but it did not help. Tr. 54-55. Abel has been treated at the pain clinic. Tr. 58. He was prescribed Percocet but no longer takes it because it was effective initially but would wear off. Tr. 58-59. Abel was interested in medication that provided more continuous pain relief. Tr. 59. Abel switched to a fentanyl patch and indicated that the patch helped. Tr. 59.

Abel estimated being able to walk for 30 feet before he gets uncomfortable and has to stop and rest. Tr. 61. He can comfortably lift about five pounds. Tr. 61. Abel has trouble using his hands. Tr. 61. Abel believes it is due to carpal tunnel. Tr. 61. When asked if he was diagnosed with carpal tunnel, Abel indicated he had testing performed back in 2012. Tr. 61-62. At the conclusion of Abel's testimony, Abel's counsel and the ALJ discussed EMG testing from 2015, noting no clear diagnosis of carpal tunnel but that the testing involved both lower limbs and the left upper limb with attention to peroneal, tibial, sural, median and ulnar nerves. Tr. 68.

During a typical day, Abel showers, gets dressed, and usually lies in bed because it is the most comfortable position for him.  Tr. 62.  Abel uses a shoe horn or gripper to put his shoes on. Tr. 62.  He watches television and uses the computer to check email.  Tr. 63.  Abel has trouble following what is going on during a television show.  Tr. 63.  Abel generally does not prepare meals. Tr. 63.  His roommate, who is retired, prepares meals.  Tr. 63.  Abel does not assist with household chores.  Tr. 63.  Abel attends church every Sunday.  Tr. 64-65.  It is about 10 miles from his house.  Tr. 64-65.  Abel drives himself to church or his aunt picks him up.  Tr. 65. Abel's father drove him to the hearing.  Tr. 65.  Abel used to enjoy fishing but is afraid to go because the boat is unstable.  Tr. 65.  He does not ever go fishing from a pier.  Tr. 65.

## 2.    Vocational expert's testimony

The Vocational Expert Roxanne Benoit ("VE") testified at the hearing.  Tr. 69-77.  She described Abel's past relevant work as a machinist and tool crib attendant, explaining that the jobs were skilled, medium per the DOT but heavy as performed.  Tr. 70-71.  The ALJ proceeded to ask the VE a series of hypotheticals describing individuals with various exertional and non-exertional limitations, including limitations that mirrored the RFC.  Tr. 71-76.  In response, the VE identified jobs that would be available to those hypothetical individuals and she provided national job incidence data for the identified jobs.  Tr. 71-76.  The VE also provided testimony for tolerances for off-task behavior and absences.  Tr. 76.  The VE indicated that being off-task 15% of the workday would be work preclusive and missing work one time per month on an ongoing basis would result in termination.  Tr. 76.  Also, the VE testified that, if the individuals described in the ALJ's hypotheticals would need to take an unscheduled break every hour, lasting from 5-to-30 minutes, there would be no jobs available.  Tr. 77.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[4] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[5] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must

---

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her March 26, 2018, decision the ALJ made the following findings:[6]

1.     Abel meets the insured status requirements of the Social Security Act through December 31, 2021. Tr. 14.

2.     Abel has not engaged in substantial gainful activity since February 23, 2016, the alleged onset date. Tr. 14.

3.     Abel has the following severe impairments: spinal stenosis, degenerative disc disease, depression, and anxiety. Tr. 14-15. Abel's diabetes is a non-severe impairment. Tr. 15.

4.     Abel does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 15-16.

5.     Abel has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance; occasionally stoop; frequently kneel and crouch; occasionally crawl; never be exposed to hazards such as moving machinery and unprotected heights; requires the ability to shift from a sitting to a standing position every thirty minutes for one to two minutes in the immediate vicinity of the work station; requires the use of

---

[6] The ALJ's findings are summarized.

an assistive device (cane) to ambulate; can perform simple, routine, and repetitive tasks with no production pace (no assembly lines) in a structured, predictable work setting that does not undergo frequent changes; and necessary changes need to occur infrequently, be adequately and easily explained, and be implemented gradually. Tr. 16-20.

6.      Abel is unable to perform any past relevant work. Tr. 20-21.

7.      Abel was born in 1969 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 21.

8.      Abel has at least a high school education and is able to communicate in English. Tr. 21.

9.      Transferability of job skills is not material to the determination of disability. Tr. 21.

10.     Considering Abel's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Abel can perform, including office helper, sorter, final assembler, and mail clerk. Tr. 21-22.

Based on the foregoing, the ALJ determined Abel was not under a disability, as defined in the Social Security Act, from February 23, 2016, through the date of the decision. Tr. 22.

## V. Plaintiff's Arguments

Abel argues: (1) the ALJ erred in weighing the medical opinion evidence; (2) the ALJ erred in failing to consider all of Abel's medical impairments; and (3) the ALJ erred in assessing his credibility and in failing to consider all of Abel's limitations and restrictions. Doc. 17, pp. 7-14, Doc. 21, pp. 1-6.

## VI. Law & Analysis

### A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B. Reversal and remand is warranted

Abel challenges the weight the ALJ assigned to the medical opinion evidence, including the opinions rendered by his treating physicians Dr. Fisher and Dr. Healy; the opinions contained in the FCE performed by Ms. Dunphy and countersigned by Dr. Healy; and the opinions rendered by the state agency reviewing physicians.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d

365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802, 804 (6th Cir. 2011). However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). The "procedural 'good reasons' rule serves both to ensure the adequacy of review and to permit the claimant to understand the disposition of [her] case." *Miller v. Berryhill*, 2018 WL 3043297, * 7 (E.D.Mich., May 29, 2018)(quoting *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 550-51 (6th Cir. 2010)), *report and recommendation adopted*, 2018 WL 3036340 (June 19, 2018).

For claims filed prior to March 27, 2017, the regulations define a "treating source" as a claimant's "own acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §404.1527(a)(2). Further, for claims filed prior to March 27, 2017, "acceptable medical source" includes licensed physician, licensed psychologist, licensed optometrist but does not include physical therapists or registered nurses. 20 C.F.R. § 404.1502(a). Nevertheless, the opinion of a medical source who is not an "acceptable medical source" who has seen a claimant in her professional capacity is relevant evidence to be considered. SSR 06-03p, 2006 WL 2329939, * 6 (August 9, 2006).

"In appropriate circumstances, opinions from State agency medical ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3 (July 2, 1996)). "One such circumstance may occur, for example, when the 'State agency medical ... consultant's opinion is based on a review of a complete case record that ... provides more detailed and comprehensive information than what was available to the individual's treating source.'" *Id.* Thus, an ALJ is not precluded from considering and relying upon opinions of state agency reviewing physicians even when those physicians have not reviewed the entirety of the record. *See Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011) ("There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record.") (discussing SSR 96-6p, 1996 WL 374180, at *2 (1996)). However, "[w]here a non-examining source did not review a complete case record, [courts] require some indication that the ALJ at least considered these

facts before giving greater weight to that opinion." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (quoting *Blakley*, 581 F.3d at 409 (internal quotations omitted)).

Abel challenges the specific weight assigned to Dr. Fisher's opinions, Dr. Healy's opinions, and the FCE that was countersigned by Dr. Healy. He argues that the ALJ erred in assigning less weight to the treating opinions than to the opinions of the state agency reviewing physicians who rendered their opinions in September 2016 and November 2016, which was after the first back surgery (February 2016) but prior to the second back surgery (May 2017). Further, Abel argues that the state agency reviewing physicians did not have before them other relevant evidence of record, including Dr. Fisher's September 2017 opinion and the September 2017 FCE, both of which were completed after the second back surgery.

The evidence post-dating the state agency reviewers' opinions is fairly extensive and includes evidence of an additional back surgery at an area of the lumbar spine different than the first surgery. The evidence also includes opinions from a long-time treating physician – Dr. Fisher – who provided pain management treatment to Abel as well as an FCE ordered by and countersigned by Abel's treating neurosurgeon – Dr. Healy. Those opinions reflect an individual who is limited to less than a full range of sedentary work whereas the state agency reviewing physicians opined that Abel could perform light exertional work with some postural and environmental limitations. While the ALJ considered evidence post-dating the state agency reviewing physicians' opinions and weighed the opinions post-dating the state agency reviewing physicians, there is no indication how or whether the ALJ took into account the fact that the state agency reviewers' opinions were rendered without a review of a significant portion of the relevant medical evidence.

Furthermore, the ALJ's reasons for discounting the more restrictive treating source opinions, which themselves are fairly consistent with each other, are somewhat conclusory and/or not fully explained. The ALJ indicated that Dr. Fisher's opinions were based <u>entirely</u> on Abel's subjective reports of pain. Tr. 19. However, in his 2017 medical statement, Dr. Fisher noted clinical findings and objective signs of: tenderness and leg numbness. Tr. 651. Additionally, Dr. Fisher noted a failed L5-S1 back surgery, failed functional capacity, and treatment which included surgery as well as multiple medications. Tr. 651.

In discounting the treating source opinions, the ALJ also pointed to evidence of "normal" examination findings. However, the examination findings were not always "normal." For example, the ALJ noted that, during an April 2017 visit, Dr. Healy observed a tight foraminal area over the left L5-S1 level; positive straight leg raise and absent ankle jerk on the left side; and slight gastrocnemius weakness. Tr. 18, 595. During this same visit, Dr. Healy noted his recommendation for a second surgery. Tr. 595. When discounting the FCE performed in September 2017, the ALJ acknowledged the April 2017 abnormal findings but appears to minimize them by pointing to examination findings from an office visit almost a year earlier in May 2016, indicating "no profound weakness, sensory loss, reflex changes, or swelling." Tr. 19 (citing Ex 8F/58 (Tr. 498, May 18, 2016, Dr. Healy notes) and Ex 15F/1 (Tr. 595, Dr. Healy April 5, 2017 notes). Additionally, during January and February 2017 pain management visits, Dr. Fowler noted abnormal physical examination findings, including positive straight leg raise, limited lumbar range of motion, paraspinal tenderness bilaterally, and antalgic gait to the left. Tr. 670, 673-674. Dr. Fowler also observed that Abel ambulated from sitting to standing with difficulty and stood most of the time during an exam. Tr. 670, 673.

Furthermore, while there may have been "normal" examination findings, Abel's treating neurosurgeon nevertheless recommended and performed a second surgery and Abel continued to require pain management following that additional surgery. Additionally, before proceeding with the second surgery, Abel sought a second opinion from Dr. Lewis regarding Dr. Healy's surgical recommendation and Dr. Lewis concurred with Dr. Healy's course of treatment.

Without a more thorough explanation by the ALJ as to how the state agency reviewing physicians' opinions, which predated some significant medical history, were entitled to the greatest weight even though their opinions were not based on more detailed or comprehensive information than was available to Abel's treating sources, the Court is unable to assess whether the ALJ's decision is supported by substantial evidence. Accordingly, reversal and remand is necessary for further proceedings consistent with this opinion.

Abel raises other errors in this appeal, i.e., that the ALJ did not fully consider all of Abel's medical impairments and the ALJ did not properly assess Abel's credibility or consider all of Abel's limitations and restrictions. With respect to Abel's claim that the ALJ did not fully consider all of his medical impairments, namely, evidence relating to a cervical MRI and testing showing chronic radiculopathy with evidence/suggestion of severe upper lumbar plexopathy at L2-3-4, although Abel has not demonstrated clear error on this point, since remand is required, on remand the ALJ should clarify whether this evidence has been considered when assessing Abel's RFC. With respect to Abel's final argument, since further evaluation of the evidence may have an impact on the ALJ's findings with respect to Abel's subjective complaints and/or Abel's limitations and restrictions, the Court declines to consider the argument. *See e.g.*, *Trent v. Astrue*, 2011 WL 841538, * 7 (N.D. Ohio Mar. 8, 2011).

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this Memorandum Opinion and Order.

Dated: January 15, 2020

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge